**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**ROOSEVELT JOHNSON,**

                **Petitioner,**

**v.**                                   **NO. 1:02CV4-MMP/AK**

**MICHAEL W. MOORE, et al.,**

                **Respondents.**


**<u>REPORT AND RECOMMENDATION</u>**


This cause is before the Court on Petitioner's petition for writ of habeas corpus. Doc. 1. Petitioner is represented by counsel and has paid the filing fee. Respondents have answered the petition, Doc. 9, and Petitioner has filed his reply. Doc. 14. Petitioner has also requested a hearing. Doc. 17. This matter is therefore in a posture for decision.

Petitioner raises two grounds for relief: (1) denial of effective assistance of counsel, and (2) unconstitutional withholding by the State of material, favorable information. Doc. 1. Respondents admit that the petition is timely, Doc. 9 at 15, but argue that Petitioner is not entitled to any relief "due to the procedural posture of said claims and their lack of record support." *Id.* at 1. Having carefully considered the matter, the Court recommends that habeas relief be denied and this cause be dismissed.

**BACKGROUND**

On July 9, 1988, just before 9:00 a.m., a lone black male entered the Econo Lodge in Gainesville, Florida, rapidly approaching the desk clerk, Debra Palmer.  When Ms. Palmer asked the man if she could help him, he jumped over the counter and pushed a gun into her back.  The man ordered Ms. Palmer to put all the money from the cash drawer, including the rolled coins, into a plastic bag and then forced her to take him to an unoccupied room.  She complied.  Once inside the room, the man pulled the curtains, directed Ms. Palmer to undress, and then sexually assaulted her.  The man did not ejaculate during the assault.   The man then directed Ms. Palmer to get dressed and tied her up with the scarf from her blouse.  After he left the room, Ms. Palmer was able to free herself and promptly called the police.

According to Ms. Palmer, the entire incident lasted approximately fifteen to twenty minutes, and after the initial contact in the motel lobby when he first approached her, she did not see the man's face again.  She did, however, describe the gun the man was carrying.

Approximately five hours later, Petitioner was arrested after he was stopped in a blue Hyundai for a traffic violation.  During the stop, the officer noticed that Petitioner had a gun, and he was arrested on a weapons charge.  When police searched the car, they found several rolls of coins and a Rubbermaid trash can similar to those used at the Econo Lodge.

Some time later, the police compiled a photographic lineup which included Petitioner's photograph.  Ms. Palmer could not positively identify Petitioner as her assailant, but she picked his photograph out as one that "had really affected her."

Notably, Petitioner had been a guest at the Econo Lodge on several occasions and had been checked into the motel by Ms. Palmer approximately a month earlier. In compiling the lineup, the police did not attempt to include photographs of other previous guests.

Other witnesses advised police that they had seen Petitioner at the Econo Lodge on other occasions, and that on the day of the robbery and assault, they had either seen him walking in the motel corridor or leaving the parking lot of the motel in a blue Hyundai.

At trial, Ms. Palmer unequivocally identified Petitioner as her assailant. It was not until immediately before the State rested that Petitioner's counsel moved to "suppress and/or exclude the in-court identification made by Deborah Palmer of Mr. Roosevelt Johnson," Doc. 10, Ex. C at 202, arguing that the police had "obtained a pretrial identification by means of an unnecessarily suggestive procedure," *id.*, and that the "unnecessarily suggestive" lineup "tainted further identification of Mr. Johnson." *Id.* at 203. In particular, counsel criticized the composition of the lineup and questioned the reliability of the identification:

> What you have is a situation where Ms. Palmer has been through a traumatic incident at the Econo Lodge, she is shown a photographic lineup with only one person that we know she has ever met, not only has she met him but she met him at the Econo Lodge. I believe that that is unnecessarily suggestive and has tainted further identification of Mr. Johnson.

> She states that she has never seen him since the incident, she has never viewed a photographic lineup since five days after the incident, she has never been presented a live lineup or appeared at any court proceeding when Mr. Johnson was present. She simply stated that she walked into court, looked over and identified him in court.

*Id.*

      After hearing argument from the State, the court found:

> The issue apparently is whether the State has met its burden of showing by clear and convincing evidence that the courtroom identification had an independent source and that the courtroom identification is sufficiently reliable to submit it to the jury.  I find that it is and that the State has met that burden, although I submit it is a close question.

*Id.* at 208-09.

      The State then rested, *id.* at 211, and Petitioner's trial counsel moved for a judgment of acquittal, which the court denied.  *Id.* at 215.  Petitioner then rested as well. *Id.*

      On January 27, 1989, the jury convicted Petitioner of robbery with a firearm, armed kidnapping, and three counts of sexual assault.  Doc. 10, Ex. A at 60-64.  The court sentenced him to life imprisonment.  *Id.* at 65-70.

      Petitioner filed a direct appeal challenging the out-of-court identification "as the product of an unnecessarily suggestive photographic lineup procedure."  *Id.* at 88-88A. More specifically, Petitioner attacked the photographic lineup on the basis that it "was not restricted to black men who, like [Petitioner], were known to have been former guests at the hotel where the victim worked."  *Id.* at 88A.  On January 29, 1991, the court of appeal issued its mandate affirming Petitioner's conviction.  *Id.* at 87.  In its opinion, the court found that the lineup was not impermissibly suggestive "in...context," the context being that the

> single asserted visual contact between the victim and [Petitioner] prior to the crime occurred when the victim registered [Petitioner] as a guest at the hotel on one occasion a month before the crime.  The officer who compiled the photographic lineup testified that, although she became aware at the time she was compiling the lineup that [Petitioner] had stayed at the hotel on one occasion prior to the crime and had been registered by

the victim, she had no knowledge of whether any of the six individuals
other than [Petitioner] had ever been a guest at the hotel or in contact with
the victim prior to the crime.

*Id.* at 88A.  The court also found that there was "no substantial likelihood of irreparable

misidentification," given the victim's "opportunity to view her assailant face-to-face at the

time of the crime, and [her] 'very certain' in-court identification of [Petitioner]...."  *Id.*

Noting that Petitioner "failed to either move to suppress or object at trial to this

evidence," the court found "no fundamental error in the introduction of this out-of-court

identification...."  *Id.*

On November 1, 1991, Petitioner moved for post-conviction relief in state court.

*Id.* at 91-97.  In his motion, Petitioner raised two instances of ineffective assistance of

counsel.  First, he claimed that his attorney was ineffective for failing to move to

suppress the victim's out-of-court and in-court identifications and to question witnesses

regarding his prior visits to the Econo Lodge.  *Id.* at 94.  Second, he claimed that his

attorney was ineffective for failing to question certain "alibi" witnesses, including Emma

Belle.  *Id.*

On November 6, 1991, the court entered an order denying the motion as it

related to the identifications, finding that "[a]ll of these matters were addressed by the

Appellate Court in its opinion affirming [Petitioner's] conviction."  *Id.* at 98.  More

specifically, the court found that "[c]ounsel cannot be incompetent for failing to object or

failing to move to suppress that which the Appeal Court has reviewed and determined is

not error."  *Id.*  In short, the court found that "Ground I of the [Petitioner's] Motion is

refuted by the opinion of the Appellate Court and is without merit.  Although cast in the

guise of ineffective assistance, it is a motion of record that should be and was dealt with

on appeal." *Id.*

As to the alibi issue, however, the court ordered the State to show cause why relief should not be granted or a hearing held on the substance of the allegations. *Id.* at 99.   At that time, the court also advised Petitioner of his right to appeal the order within thirty days. *Id.*

Petitioner then appealed the ruling on Ground I to the court of appeal, *id.* at 100 & 101, and the State requested that the trial court conduct a hearing on the alibi issues. *Id.* at 105-06.  Petitioner's appeal was subsequently dismissed for failure to respond to an order of the court of appeal.[1]  *Id.* at 108.

The trial court then scheduled a hearing on Ground II of Petitioner's motion for post-conviction relief for April, 1992, and appointed the state public defender's office to represent Petitioner at the hearing.  *Id.* at 109.  Thereafter ensued a series of motions to withdraw, appointments of substitute counsel, and orders continuing the hearing.  *See id* . at 111-19.  Finally, on February 5, 1993, the court appointed Mr. Tom L. Copeland as a special public defender to represent Petitioner.  *Id.* at 120-21.  Over the next five years, only sporadic activity occurred in this case.  *See id.* at 122-33.

At some point in the summer of 1998, however, Petitioner's request for post-conviction relief was placed back on track, and a hearing was set for August 28, 1998.  Prior to the hearing, several matters arose which complicated the procedural posture of this case.  First, a document entitled "Supplement to Motion for Post Conviction Relief"

--------

[1]The Court has not been provided with a copy of the order referenced in the dismissal order.  The Court assumes, however, that the order addressed certain preliminary technical or procedural issues related to a proper presentation of an appeal and did not address the merits of the appeal.

was filed on or about August 5, 1998. *Id.* at 134-35. This motion, which is signed by Petitioner but not by Mr. Copeland, catalogued additional acts of ineffectiveness on the part of Petitioner's trial counsel, including the failure (1) to advise Petitioner of certain legal rights; (2) to present defense witnesses; (3) to request forensic examination of the victim's and Petitioner's clothing; and (4) to depose certain "crucial" witnesses. *Id.* On August 21, 1998, one week before the scheduled hearing, another document—"Motion for Post Conviction Relief–Brady Violation"–was filed. *Id.* at 136-142. In this motion, Petitioner charged that the State failed to disclose favorable evidence that the victim could not identify the suspect's clothing. *Id.* at 139. This motion was likewise signed only by Petitioner, though it was clearly notarized by post-conviction counsel. *Id.* at 142.

The court opened the August 28 hearing by addressing the recent filings. With regard to the motion raising a *Brady* violation, the court stated: "That pleading is not before the Court. That's an attempt to raise a whole new issue by the defendant, pro se, about three days ago." Doc. 10, Ex. B at 4. As to the other document, the purported supplement to the post-conviction motion, the court and counsel entered into the following exchange:

> THE COURT: This is an entirely separate issue. This goes far beyond what the Court reserved to be heard in this case. This is just a wholesale attack upon [trial counsel]....
>
> Mr. Copeland, how long have you been representing [Petitioner] on this case?
>
> MR. COPELAND: I believe I was appointed in 1993.
>
> THE COURT: And it's taken you five years to perfect this supplement of motion for post conviction relief?

MR. COPELAND:     To file it.

THE COURT:        Number one, I'm not sure it's timely.  Number two, it's far beyond what the Court previously ordered and what you were appointed to represent him on.

* * *

This is a whole separate issue.  This just, basically, is a wholesale attack on [trial counsel] and some kind of inventory of the evidence that was used in the case.

* * *

MR. COPELAND:     Well, Your Honor, that's fine.  I mean [Petitioner] and I have discussed what possibly would happen today.  And I've tried to prepare for what I felt like the Court may do.

What I want to make clear was that when the supplemental motion was filed, I believe–the basis that I discussed with Mr. Johnson was that I felt like his initial motion, which alleged as the ground for the motion itself, was ineffective assistance of counsel.

Underneath that, he stated–The forms says, "Briefly state your facts."  He briefly stated two factual bases that he believed showed ineffective assistance of counsel.

THE COURT:        Right.

MR. COPELAND:     But the legal basis of the motion was ineffective assistance of counsel.

THE COURT:        No.  You can't file a motion called, "Ineffective Assistance of Counsel," under the rules that govern these kind of proceedings in the State of Florida, without specifying what it is that you believe counsel to have been ineffective in omitting, or doing, or not doing.  That is the reason that Rule 3.850 carries with it a form and directions.

Otherwise, what you have is an open-ended assault on trial counsel.  And, periodically, as you go through,

you can throw another penny into the hat.  You can add things.  That's not the way the system works.

There's also a time limitation on that system.  And I am greatly concerned with a situation, where the Court enters an order that, basically, says: One of these grounds has been ruled on, which it has, clearly.

The second ground is something that has not been ruled on, to my knowledge, not refuted by the record.  And he's entitled to a hearing, and I gave him one.

Somewhere along the line, after that, somebody decides this man needs counsel....And he gets counsel.

And five years later we had not resolved a 3.850 on the limited issue that this Court put out.

\* \* \*

Two years of the issuance of the mandate of the appellate court is the operative time that that had to [be] filed, which in my opinion would make this no more than at least four years late, probably six years late.

\* \* \*

[O]n their face, they couldn't possibly be timely....under a Rule 3.850.

You just cannot file a motion for post conviction relief and over the years, as the thought strikes you, throw in a couple of more things.  That's not the way the system works.

And I will tell you that what I am going to do today, in the time that has been set aside, is we're going to hold a hearing on the issue that the Court reserved jurisdiction...which is the failure of Mr. DeThomasis to perfect an alibi defense that this [Petitioner] says he was incompetent for not doing.

*Id.* at 5-11.

The hearing proceeded solely on the alibi issue.  At that time, Petitioner also made a written offer of proof "of what he expect[ed] the evidence to show if he [were] allowed to present evidence in support of his original Motion for Post Conviction Relief and the Supplement thereto...."  Doc. 10, Ex. A at 162- 67.  At the conclusion of the hearing, the court orally denied the original motion for post-conviction relief, finding that counsel was not ineffective for failing to present certain witnesses.  Doc. 10, Ex. B at 79-83.  Though he indicated that both the motion raising the *Brady* issue and the supplement to the original post-conviction motion were procedurally barred as untimely, he granted Petitioner the opportunity to submit argument "that the Court ought to consider those matters as not being procedurally barred...."  *Id.* at 81-82.  The court concluded by advising Petitioner of his right to appeal the ruling.  *Id.* at 83.

In response, Petitioner submitted a memorandum in support of his right to supplement his motion for post-conviction relief.  Doc. 10, Ex. A at 168-72.  He also filed a notice of appeal of the court's oral ruling made at the conclusion of the August 28, 1998, hearing denying his motion for post-conviction relief and refusing to allow Petitioner to present the supplement to the motion.  *Id.* at 176.  On March 5, 1999, the court of appeal dismissed the appeal for Petitioner's failure to respond to the court's orders requiring him to file copies of the order being appealed.  *Id.* at 177.

On April 21, 1999, the court memorialized the oral ruling, addressing two issues:

1.  Whether [Petitioner] is entitled to relief on the issue presented in his original 3.850 motion

2.  Whether the amendments/supplements to the motion are timely.

*Id.* at 178.  As to the first issue, the court found:

> In this case, counsel presented ample evidence at the hearing to explain the thought processes behind his decisions.  He sufficiently demonstrated that the choices he made were tactical in nature and in no way indicated incompetence.  After researching the possibilities brought to him by [Petitioner], counsel realized that these two witnesses [Emma Belle and Keith Mobley] could actually inculpate [Petitioner] and severely weaken his case.  Indeed, to call these witnesses in the face of such facts might well constitute ineffective assistance.

> As to the "other" witnesses [Petitioner] mentioned in his motion, he failed to provide their names, the content of their testimony, and how the omission prejudiced the outcome of the case.  Without such information, the claim as to those witnesses is legally insufficient.  The Court thus finds Ground II of [Petitioner's] original motion to be without merit.

*Id.* at 185-86.

As to the question of the supplement, which the court had taken under advisement, *see id.* at 188, the court found that neither of the exceptions to the two-year statute of limitations for filing a post-conviction motion applied, as Petitioner had not raised an issue of newly discovered evidence or a change of law.  *Id.* at 188-89.  The court also found that the document was not a proper supplement, as it was not filed within a reasonable time after the filing of the original motion, and it did not simply expand the issues previously raised but instead raised completely new issues of counsel's alleged ineffectiveness.  *Id.* at 190.  The court found alternatively that even if the document were timely, it still exceeded the scope of a supplement, and that even if it were proper in time and scope, the document was facially deficient because it was a series of conclusory allegations without statements of factual support.  *Id.* at 190-91.

As to the question of the second motion for post-conviction raising the *Brady* issue, the court found that the motion was "procedurally barred as successive and

[would] not be reviewed." *Id.* at 192.  Alternatively, the court found that the motion did not meet the requirements of *Brady.  Id.* at 192-93.

The court concluded: "**ADJUDGED** that Defendant's Motion for Post-Conviction Relief is *denied.* [Petitioner] is hereby notified that he may appeal this order to the District Court of Appeal of Florida, First District, by filing a notice of appeal within thirty days of the date this order is rendered." *Id.* at 193 (emphasis in original).

Petitioner, acting *pro se*, then filed a motion for rehearing, *id.* at 267-269, which the court denied.  *Id.* at 272-73.  He then, through counsel, filed a notice of appeal of the order denying the motion for post-conviction relief and the order denying the motion for rehearing.  *Id.* at 274-75.  On January 12, 2001, the court of appeal affirmed per curiam, with the mandate issuing on January 30, 2001.   Doc. 10, Ex. D.

On January 11, 2002, Petitioner, through counsel, filed the instant petition for habeas relief.  Doc. 1.

In his petition, Petitioner raises two claims:  (1) that his counsel rendered ineffective assistance and (2) that the State violated *Brady.*  As set forth in the attachments to the petition, Petitioner more specifically alleges that his trial counsel was ineffective for failing to call Petitioner's girlfriend, Emma Belle, as a witness, *id.* at Attach. 1, p. 11, and for failing to object to or seek suppression of both the out-of-court and in-court identifications of Petitioner by the victim.  *Id.* at Attach. 1, p. 17.  He also argues that the additional acts of ineffectiveness alleged in the supplement to his motion for post-conviction, which the state court had refused to consider, should be addressed by this Court.  *Id.* at 16.  As to the alleged *Brady* violation, Petitioner charges that the State unconstitutionally withheld information that the victim was unable to identify

Petitioner's clothing as the clothing worn by her assailant.  *Id.* at Attach. 2, p. 1.

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254, a federal court may grant habeas corpus relief only if

the state court adjudication

> (1)      resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of § 2254(d), "a federal habeas court may grant

the writ if the state court arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law or if the state court decides a case differently than

[the Supreme] Court has on a set of materially indistinguishable facts." *Williams v.*

*Taylor*, 529 U.S. 362, 412-13 (2000).  "A state-court decision will certainly be contrary

to...clearly established precedent if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405.  A state-

court decision will also be contrary to clearly established Supreme Court precedent "if

the state court confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme Court] and nevertheless arrives at a result different from [the

Court's] precedent." *Id.* at 406.

Under the "unreasonable application" clause of § 2254(d), "a federal habeas

court may grant the writ if the state court identifies the correct governing legal principle

from [Supreme Court] decisions but unreasonably applies that principle to the facts of

the prisoner's case." *Id.* at 413.  The federal court considering a habeas petition "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 412.

Further, in reviewing the decision of the state court, this Court must presume that the state court's factual determinations are correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The fact that the state court did not write "an opinion that explains the state court's rationale," does not detract from the deference owed to that court's decision. *Wright v. Secretary for Department of Corrections*, 278 F.3d 1245,1255 (11th Cir. 2002).

## **DISCUSSION**

I.      Ineffective Assistance of Counsel.

A.      Failure to call Emma Belle as  witness.

As noted previously, the issue of counsel's failure to call Petitioner's girlfriend, Emma Belle, as a witness at his trial was thoroughly explored by the trial court at the evidentiary hearing on the post-conviction motion.  Because the state court reached the merits of this identical claim, the question for this Court is whether the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States...."  28 U.S.C. § 2254(d)(1).  That task involves a consideration of *Strickland v. Washington*, 466 U.S. 668 (1984).

To prevail on a constitutional claim of ineffective assistance of counsel, a

defendant must demonstrate (1) that his counsel's performance was below an objective
and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.
*Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to
carry his burden of proof on either the performance or the prejudice prong.  *Id.* at 697.
The court need not address the adequacy of counsel's performance when a defendant
fails to make a sufficient showing of prejudice.  *Id.; see also Tafero v. Wainright*, 796
F.2d 1314, 1319 (11th Cir. 1986).

    With regard to the performance prong of *Strickland*, a defendant must provide
factual support for his contentions that counsel's performance was constitutionally
deficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  The court must
consider counsel's performance in light of all of the circumstances at that time and
indulge in a strong presumption that counsel's conduct fell within the wide range of
reasonably professional assistance.  *Strickland*, 466 U.S. at 689-90.  To show counsel's
performance was unreasonable, a defendant must establish that "no competent counsel
would have taken the action that his counsel did take."  *Grayson v. Thompson*, 257 F.3d
1194, 1216 (11th Cir. 2001) (emphasis omitted).  "An ambiguous or silent record is not
sufficient to disprove the strong and continuing presumption...that [counsel] did what he
should have done and that he exercised reasonable professional judgment."  *Chandler
v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531
U.S. 1204 (2001).

    To show prejudice, a defendant must show more than simply that counsel's
unreasonable conduct might have had "some conceivable effect on the outcome of the
proceeding."  *Strickland*, 466 U.S. at 693.  Instead, a defendant must show a

"reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id.*  Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000).  This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

Having carefully considered the matter, the Court is of the opinion that the state court adjudication of this issue did not result in a decision that was contrary to or involved an unreasonable application of *Strickland* and its progeny or in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  The Court reaches this conclusion on several grounds.

First, there is no doubt that counsel and Petitioner discussed Ms. Belle and her possible testimony on more than one occasion. *See*, *e.g.*, Doc. 10, Ex. B at 21, 27-28, 31-32, 37-41, & 72.  This shows that counsel did not make the decision regarding Ms. Belle without input from his client.  Second, there is no dispute that counsel followed up on Petitioner's information and interviewed Ms. Belle.  After meeting with her, however,

he made several determinations.  First, he determined:

> [S]he not only could not help, she actually could hurt, in that she established that [Petitioner] had left the Red Carpet Inn [in Gainesville], which is where they were staying, and she didn't know where he was going or what he was going to do.
>
> And when he left and to where he was going and to what he was going to do, fit right into the time pattern that the State was alleging that's when all these crimes took place.
>
> So it–in effect, she almost established that, yeah, he could potentially be out there on the streets, within the town, available to commit these acts.

*Id.* at 39.

Although Petitioner attempts to undermine this conclusion by arguing that the jury had already learned through one of the investigating detectives that Petitioner "had the opportunity to commit the offense," Doc. 1, Attach. 1 at 13, he mischaracterizes the detective's testimony which purportedly supports this argument.  The detective did not testify, as Petitioner states, that "Emma Belle told him that [Petitioner] left their hotel room the evening before the offense and never returned."  *Id.*  Rather, on questioning by defense counsel on cross and re-cross examination, the officer testified as follows:

> Q    In the course of your investigation did you likewise learn that [Petitioner] was staying at the Red Carpet Inn with a girl friend?
>
> A    Yes, I did.
>
> Q    And you in fact located a girl friend of his at the Red Carpet Inn?
>
> A    Yes, I did.
>
> * * *
>
> Q    Detective Cooper, did you get her name?
>
> A    No, I did not.

Q       Did you verify with the girl friend at the Red Carpet Inn the whereabouts of [Petitioner] on the previous night?

A       She said he had left that evening.  She had no other information.

Doc. 10, Ex. C at 175 & 177.

It is clear from this exchange that counsel elicited only Petitioner's whereabouts on the evening preceding the robbery and assault, not his whereabouts during the critical time frame.  By not calling Ms. Belle, counsel successfully prevented any testimony from being placed before the jury that would have established in its mind the real possibility that Petitioner "could potentially be out there on the streets, within the town, available to commit these acts."  Doc. 10, Ex. B at 39.

After talking with Ms. Belle, counsel also decided that although Ms. Belle could offer an explanation for Petitioner's possession of the rolled coins at the time of his arrest,[2]  *id.* at 40-41, there were "problems in calling her," *id*. at 43,  regarding this issue:

> [T]he rolled coins that were taken from [Petitioner's] vehicle at the time of his arrest, which were placed into evidence, had a distinctive marking on the paper wrapping, itself.  They were stamped with the name of a bank.
>
> And, without disclosing to Emma Belle the name of that bank, I asked her where she banked.  And I asked her where she got the paper rolls, the wrappers to put the coins in.
>
> And I asked her where she would deposit or receive the wrappers, or what have you, which happened to be the Dade County Employees Federal Credit Union.  That was disclosed to me.
>
> I knew that the particular bank and–again, we'd have to look to the record.  I don't have the trial transcript.  But it came out–I can't think of her name.  But the woman who was either the owner or the manager...of the

_____

[2] Ms. Belle would have testified that she had a habit of rolling coins on long road trips.  Counsel's notes indicated that "she did not specifically state that she took rolled coins on this particular trip but, rather, her habit was to take loose coins and roll them while on various trips that they have taken."  *Id.* at 50-51.

[Econo Lodge] that was robbed, actually, testified that she recognized those rolled coins, from the marking of the bank.  Because that's a bank that she deals with.

And my recollection is that it was...not...a local Gainesville bank.  It was like a bank a little bit in the outskirts of town; which was, potentially, somewhat unusual.  But that's why it stood out to her, and they were very recognizable to her.  So that conflicted, I thought, greatly with Emma Belle's...potential testimony.

*Id.* at 43-44.  In short, the "wrappers involved in the robbery, seized as evidence by the police in this case, came from [a] different source than those wrappers that Emma Belle told [counsel] that she had a habit of wrapping coins up in[.]"  *Id.* at 44.

Though counsel was unable, after almost ten years, to recall the particulars of the manager's testimony,[3] he did not thereby render ineffective assistance of counsel on this issue.  Counsel's notes reflected that he questioned Ms. Belle about the types of coin wrappers that she habitually used and that he was satisfied that there was some kind of discrepancy between the type of wrappers which Ms. Belle said she used and the type that were found in Petitioner's car.  That counsel thought, ten years after the fact, that the discrepancy involved two different bank marks is insignificant.  What is important is that before trial, counsel investigated the coin issue, evaluated Ms. Belle's proposed testimony, and determined that it was problematic.  In light of what counsel learned, it was not outside the realm of professional judgment to want to prevent the prosecution (1) from focusing on the fact that the one identifiable roll of coins was rolled in a wrapper marked with the name of the motel next door to the Econo Lodge,

---

[3]As Petitioner points out, the Econo Lodge manager was able to identify only one roll of dimes as having been stolen from the motel.  She identified the roll based on the fact that the wrapper was imprinted with the name of the motel next door to the Econo Lodge, and it was taped on the end.  Doc. 10, Ex. C at 136-37 & 142-43.  She was not able to identify the roll by a bank mark, as counsel recollected.

especially when counsel knew that Ms. Belle used coin wrappers from a bank in South

Florida, and (2) from questioning her about how she came into possession of that

particular roll of coins.   In other words, counsel "did what he should have done and...he

exercised reasonable professional judgment," *Chandler*, 218 F.3d at 1314 n.15, in that

regard.

Third, counsel determined that Ms. Belle's proposed testimony was inconsistent

with that of another possible witness, Keith Mobley.  Whereas Ms. Belle was prepared

to testify that she was the source of the rolled coins found in Petitioner's possession,

Mr. Mobley was prepared to testify that he and Petitioner had received the coins as

payment during an illegal drug transaction.  *Id*. at 46.  Furthermore, although Ms. Belle

was employed, "somewhat articulate," and a "presentable witness," *id*. at 47, she

"appeared, to [him], to be very reluctant to be involved...."  *Id*.  Indeed, counsel's

recollection was that he had to ask Petitioner's parents "to assist in trying to locate her

and having her call [him]."  *Id*. at 50.  In counsel's estimation, Belle's inconsistent

testimony and her status as a "very, very reluctant witness," *id*., "related to possible

credibility problems."  *Id*.  These are all reasonable considerations in determining

whether to call a witness, and even if counsel were mistaken in his final evaluation of

these matters, his representation is not thereby rendered ineffective.

Finally, although Petitioner is correct that counsel did not present any witness

who could directly testify regarding Petitioner's gold teeth and distinctive tattoos,

counsel did place the identification issue before the jury, albeit without Ms. Belle's

testimony, by questioning different prosecution witnesses, including the victim,

regarding whether they had noticed these as characteristics of the assailant or the man

others saw leaving the Econo Lodge or Petitioner when he was questioned.[4]  *See*, *e.g.*, Doc. 10, Ex. C at 37, 58-59, 106-108, 169, 172, & 175-177.  While counsel admitted that Ms. Belle could have assisted with the identification issue and testified regarding Petitioner's tattoos and teeth,[5] he "balanced[d] the value of her good testimony with her bad testimony," Doc. 10, Ex. B. at 65, discussed the matter with Petitioner, and made a "conscious and...knowing decision," *id.*,  not to call her as a witness.

This is a classic example of the type of strategic decision which *Strickland* protects.  When an attorney is confronted with a witness who possesses not only potentially exculpatory information but also inculpatory information which the attorney wants to keep from the jury's consideration, he often must perform this balancing of the witness' testimony.  Although his decision may not, in hindsight, be the "correct" decision or the "best" decision, the law is such that counsel's decision is protected unless it was unreasonable and outside the realm of what a competent attorney would have made.  Despite Petitioner's protestations to the contrary, there is simply nothing in the record to suggest that counsel's decision regarding Ms. Belle was anything other than a reasonable strategic decision.[6]

---

[4]Although the jury saw Petitioner's gold teeth when he flashed them at the jury without objection from the prosecution, *id.* at 59, the jury never saw the tattoo or heard from any witness who remembered seeing it.

[5]Counsel's notes reflected that Ms. Belle had known Petitioner since junior high school and that they had been "'going out'" since 1982.  *Id.* at 54.

[6]In fact, Petitioner himself has provided a final strategic justification for not presenting Ms. Belle as a witness.  At the evidentiary hearing, Petitioner testified that counsel decided not to call Ms. Belle because he "wanted not to bring no witness, because of the simple fact he wanted to have the last say-so in the trial court."  *Id.* at 72. Pursuant to Fla. R. Crim. P. 3.250, a defendant is entitled to make the concluding argument in closing if he offers no witnesses or if he offers no one other than himself as

For all of these reasons, the Court finds that the state court adjudication of the ineffective assistance of counsel claim related to counsel's decision not to call Emma Belle as a witness was neither contrary to nor involved an unreasonable application of *Strickland* and its progeny and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, Petitioner's ineffective assistance of counsel claim on this claim should be denied.

B.    Failure to seek suppression of or to object to victim's out-of-court and in-court identifications of Petitioner.

As noted previously,[7] the issue of the victim's out-of-court and in-court identifications was raised in one form or another in different state court proceedings. On the first occasion, Petitioner raised the issue of the victim's **in-court** identification at trial.  At that time, Petitioner argued that the in-court identification was tainted by the "unnecessarily suggestive" out-of-court lineup which the police had used during their investigation of the Econo Lodge crimes.  The trial court denied Petitioner's motion to suppress or exclude the identification, finding that the State had met its burden of

_____

a witness.  *Lamar v. State*, 583 So.2d 771, 772 (Fla. Ct. App. 1991).  *See also Freeman v. State*, 846 So.2d 552, 554-55 (Fla. Ct. App. 2003) (defendant's right to make final closing argument, where no evidence except defendant's own testimony has been introduced is vested procedural right).  At trial, counsel was able to take advantage of this procedural opportunity to open the closing arguments and then to make a rebuttal to the State's closing.  *See* Doc. 10, Ex. B at 223-46 & 266-74.  In that way, the jury began its deliberations with Petitioner's arguments for acquittal in mind, rather than the State's arguments for conviction.  Putting Ms. Belle on the stand would have closed that opportunity, thereby reinforcing counsel's decision not to use her as a witness.

[7]The Court has meticulously outlined the arguments and rulings made on this issue in the Background section of this R&R.  A summary of those arguments and rulings will now suffice except where necessary to explain the Court's decision.

showing that the in-court identification was independent and reliable.

The second time that an identification issue arose was on appeal.  On that occasion, Petitioner directly challenged the **out-of-court** identification  "as the product of an unnecessarily suggestive photographic lineup procedure" but did not challenge the victim's in-court identification.  The appellate court found (1) that the lineup was not impermissibly suggestive, (2) that, given Ms. Palmer's face-to-face encounter with Petitioner and her unequivocal in-court identification, there was no substantial likelihood of misidentification, and (3) that there was no fundamental error in the introduction of the lineup where Petitioner failed to object to or request suppression of the lineup during trial.

Finally, on post-conviction, Petitioner relied on both the **in-court and out-of-court** identifications as the basis for an ineffective assistance of counsel claim, identical to the one now before this Court.  The trial court rejected this ground for relief, finding that counsel was not ineffective for failing to object to or to seek suppression of  "that which the Appeal Court has reviewed and determined is not error."

 The first question which the Court must resolve is whether this issue of ineffectiveness, attacking both the in-court and out-of-court identifications, was adjudicated on the merits in state court.  If so, then the state court decision is entitled to deference unless it resulted in a decision contrary to *Strickland* or involved an unreasonable application of *Strickland*.  If, however, the state court failed to resolve the merits of this claim, then the "controversy falls outside of § 2244(d)(1)'s requirement that [the Court] defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law." *Davis v. Secretary for Department of*

*Corrections*, 341 F.3d 1310, 1313 (11th Cir. 2003).  In that situation, this Court must examine the merits of the claim.

As noted, the only identification issue raised on direct appeal related to the out-of-court identification; the in-court identification was not an issue on direct appeal. Thus, when the post-conviction court stated that counsel was not ineffective for failing to pursue "that which the Appeal Court has reviewed and determined is not error," it becomes clear that the post-conviction court reached the merits of counsel's effectiveness only as it related to the out-of-court identification question.  Therefore, as to that claim, the state court adjudication is entitled to deference unless it resulted in a decision contrary to *Strickland* or involved an unreasonable application of *Strickland*.  It bears reiterating that it is not this Court's function independently to assess the correctness of the state court's decision on this issue, *see Williams*, 529 U.S. at 412, but to determine whether "in rejecting [the] ineffective assistance of counsel claim, the state court 'applied *Strickland* to the facts of [the] case in an objectively unreasonable manner.'"  *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004) (citation omitted).

Having carefully considered the matter, the Court finds that as to the ineffective assistance of counsel claim predicated on counsel's failure to object to or to move to suppress the out-of-court identification, Petitioner is not entitled to habeas relief.  In finding that counsel did not act ineffectively in failing to challenge the photographic lineup at trial, the state court relied on the appellate court's finding that there was nothing inherently improper about the out-of-court identification.  An attorney does not act deficiently under *Strickland* in failing to make a meritless evidentiary challenge. Even if the Court assumes that counsel acted deficiently in not directly objecting to the

out-of-court identification,[8] Petitioner would still be required to show that he was

prejudiced by counsel's failure.  In that context, Petitioner would initially have to prove

that a challenge to the photographic lineup was a meritorious claim that necessitated

the filing of a motion to suppress.  *Huynh v. King*, 95 F.3d 1052, 1058 n.6 (11th Cir.

1996).  This brings the Court full circle to the appellate court's finding that the

photographic lineup was not impermissibly suggestive, and indeed, it appears that the

appellate court examined and applied the relevant state law in assessing the propriety

of the lineup.  *See*, *e.g.*, *Fitzpatrick v. State*, No. SC01-2759, 2005 WL 168510, at *13-

14 (Fla. Jan. 27, 2005).  The post-conviction court recognized that an attack on the out-

of-court identification was a matter to be addressed on direct appeal, that it was in fact

addressed on direct appeal, and that counsel cannot be ineffective for failing to prevail

on a meritless objection.  This Court does not believe that this was an unreasonable

interpretation or application of *Strickland*.

　　　　As to the in-court identification, the Court reaches a similar conclusion via a

slightly different route.  The state court did not reach the merits of Petitioner's post-

conviction claim that counsel was ineffective for failing to move to suppress or to object

to the in-court identification; thus, the Court does not extend to this claim the deference

afforded the out-of-court identification.  Nevertheless, the Court does not believe that

counsel rendered ineffective assistance in this regard.  Counsel specifically attacked the

credibility of the in-court identification after it was made by the victim in an attempt to

have it excluded by the judge.  Until Ms. Palmer testified, counsel could not reasonably

---

　　　　[8]As previously noted, in challenging the in-court identification, counsel specifically
attacked the composition of the photographic lineup and its suggestive nature.

*Case No: 1:02CV4-MMP/AK*

have known whether she would be able to make a positive identification, especially when her out-of-court identification had been less than positive. However, once she did unequivocally identify Petitioner as her assailant, he took appropriate steps to cast doubt on its reliability. When the court refused to exclude the in-court identification, counsel used the issue of identification–including the victim's in-court and out-of-court identifications–as the frame for his closing arguments to the jury, specifically highlighting the reasonableness of his argument that the police had tainted the victim's identification through the composition of the lineup and that Ms. Palmer had made a "sincere" misidentification of Petitioner as her assailant. *See*, *e.g.*, Doc. 10, Ex. C at 324-28. Although another attorney may have handled the in-court identification issue differently, this Court does not find anything deficient about the manner in which trial counsel handled this matter, and it cannot say that "no competent counsel would have taken the action that [Defendant's] counsel did take." *Grayson*, 257 F.3d at 1216. Thus, this claim of ineffective assistance fails as well.

C.      Failure to call certain witnesses and other omissions as set forth in Supplement.

As previously noted, in early August, 1998, almost seven years after the filing of the Rule 3.850 motion, Petitioner filed a document entitled "Supplement to Motion for Post Conviction Relief," alleging additional acts of ineffectiveness on the part of Petitioner's trial counsel, including the failure (1) to advise Petitioner of certain legal rights; (2) to present defense witnesses; (3) to request forensic examination of the victim's and Petitioner's clothing; and (4) to depose certain "crucial" witnesses.

The court found (1) that the supplement was untimely and that its tardy filing was not excused by any exception, and (2) that it was not a proper supplement, not only

because it was not filed within a reasonable time after the filing of the original motion but also because it raised entirely new issues of ineffectiveness.  Alternatively, the court found that even if the document were timely, it still exceeded the scope of a supplement, and that even if it were proper in time and scope, the document was facially deficient because it was conclusory and devoid of factual support.  In no respect did the court address the federal claims raised in the "Supplement."

Petitioner now argues that the claim was not procedurally defaulted in state court because the state court's ruling did not constitute an independent and adequate state rule of decision.  Doc. 1, Attach. 1 at 16.  In response, Respondent argues that the claims raised in the supplement were procedurally defaulted and thus not exhausted, but even if the claims are technically exhausted, Petitioner cannot meet the cause and prejudice standard to overcome the failure to exhaust this claim.  Doc. 9.

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999) (citing 28 U.S.C. §§ 2254(b)(1) & (c)).  To fully exhaust state remedies, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *Id.* at 845.

Furthermore, "the federal claim must be fairly presented to the state courts," and it must be "the same claim."  *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *see also Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard*).  Consistent with this requirement, federal "habeas petitioners generally may not raise ineffective assistance of counsel claims except on grounds specifically presented to the state courts."

*Jackson v. Herring*, 42 F.3d 1350, 1355 (11th Cir. 1995) (citing *Footman v. Singletary*,

978 F.2d 1207, 1211 (11th Cir. 1992)).

When a state court refuses to address a prisoner's federal claims "because the

prisoner [has] failed to meet a state procedural requirement," this Court is barred by the

independent and adequate state ground doctrine from considering the federal claim in a

habeas proceeding.  *Coleman v. Thompson*, 501 U.S. 722, 730 (1991).   Claims which

have not been fairly presented to the state court but are defaulted from state court

review are considered technically exhausted because no remedies are available for

purposes of § 2254(c).  *Coleman*, 501 U.S. at 732.  *See also White v. State*, 664 So.2d

242, 244 (Fla. 1995) (claims that could have or should have been raised on post-

conviction and were not so raised are procedurally defaulted).  However,

> In all cases in which a state prisoner has defaulted his federal claims in
> state court pursuant to an independent and adequate state procedural
> rule, federal habeas review of the claims is barred unless the prisoner can
> demonstrate cause for the default and actual prejudice as a result of the
> alleged violation of federal law, or demonstrate that failure to consider the
> claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750.  Thus, where a petitioner has not presented to the

state court the specific instances of ineffective assistance of counsel which he

alleges in his federal habeas petition, he must, because he is precluded under

Florida law from presenting those claims in a successive 3.850 motion,

demonstrate cause and prejudice for his state court procedural default.  *Grubbs*

*v. Singletary*, 120 F.3d 1174, 1178 (11th Cir. 1997).

Although Petitioner previously attempted to present additional instances of

alleged ineffectiveness via the "Supplement," the state court refused to consider

the merits of the new allegations because the "Supplement" was untimely and

not presented in the proper form.  The court did not even discuss the federal claims raised therein, finding that the petition failed to meet the procedural requirements of Rule 3.850.  This is unquestionably the type of independent and adequate state ground envisioned by *Coleman*.

Thus, because these precise claims of ineffectiveness were procedurally defaulted in state court and Petitioner may not now return to state court to raise them, they are "technically exhausted," and Petitioner must now show cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that this Court's failure to consider the claims will result in a fundamental miscarriage of justice.  Petitioner has not even addressed these issues, and the Court cannot discern anything from the record which would meet these criteria.  This claim of ineffective assistance of counsel should therefore be dismissed as well.

II.  *Brady* violation.

In state court, Petitioner attempted to raise a *Brady* issue one week before the hearing on his motion for post-conviction relief, which was, as previously noted, almost seven years after the post-conviction motion was filed.  In this motion, Petitioner charged that the State failed to disclose favorable evidence that the victim could not identify the suspect's clothing in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  As to this motion, the court unequivocally found that the motion was procedurally barred as successive.  It alternatively found that the motion did not meet the requirements of *Brady.*

Petitioner procedurally defaulted this claim in state court.  The *Brady* claim

is, however, technically exhausted since Petitioner may not now return to state court to pursue it further.  Petitioner must therefore show cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that this Court's failure to consider the claims will result in a fundamental miscarriage of justice.  As with the ineffective assistance of counsel claim discussed in the preceding section, Petitioner has not addressed these issues, and the Court cannot discern anything from the record which would meet these criteria, and it will not further consider this claim.

## CONCLUSION

A hearing on Petitioner's claims is not necessary, and thus, having carefully considered the matter, the undersigned respectfully **RECOMMENDS:**

That the petition for writ of habeas corpus, Doc. 1, be **DENIED**;

That the motion for hearing, Doc. 17, be **DENIED**;

That this cause be **DISMISSED WITH PREJUDICE**.

**IN CHAMBERS** at Gainesville, Florida, this **14ᵗʰ** day of April, 2005.


**s/ A. KORNBLUM                                    **
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

*Case No: 1:02CV4-MMP/AK*